## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUZANNE KEEFER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO. 3:04-187 |
| JAMES DURKOS, individually, MARY | ) |
| ELLEN DEAL, individually, DONNA | ) |
| YOUNKIN, individually, JANET VIRGIN, | ) |
| individually, JOHN DOE, individually, and | ) |
| JANE DOE, individually, and JAMES | ) JUDGE GIBSON |
| DURKOS, MARY ELLEN DEAL, DONNA | ) |
| YOUNKIN, and JANET VIRGIN in their | ) |
| capacity as Directors of the Board of | ) |
| Education of the TURKEYFOOT VALLEY | ) |
| AREA SCHOOL DISTRICT, | ) |
| | ) |
| Defendants. | ) |

# Memorandum Opinion and Order of Court

## GIBSON, J.

This matter comes before the Court on the Defendants' Motion for Summary Judgment

(Document No. 74). In accordance with the Court's analysis herein, the Defendants' Motion for

Summary Judgment will be granted.

## I. Concise Statement of Material Facts[1]

Plaintiff filed a Complaint on August 10, 2004 alleging nine counts against the Defendants, both in their individual capacity and in their capacity as Directors of the Board of Education of the Turkeyfoot Valley Area School District (hereinafter "Board"). Pursuant to [Federal] Rule [of Civil Procedure] 12(b)(6), this Court dismissed Counts IV and V of Plaintiff's Complaint with prejudice. The Court also dismissed Counts VI, VII and IX without prejudice and granted leave to the Plaintiff to amend her Complaint. Plaintiff did not amend her Complaint. Therefore, Counts I, II, III and VIII remain at this time. All of the parties have been deposed and this matter is ripe for summary judgment.

Plaintiff Suzanne Keefer (hereinafter "Plaintiff") ...was elected as a secretary to the Board of Directors of the Turkeyfoot Valley Area School District on January 14, 2002 by a vote of the School District Board of Directors. Thereafter, on January 4, 2003, [Plaintiff] married the School District's Superintendent. Her lawsuit raises various state and federal claims pertaining to the termination of her employment that occurred on July 24, 2004. [Plaintiff] seeks $2,569.91 in back pay as of June 30, 2005, but the amount of back pay she is seeking as of the date of this Memorandum Opinion is unknown.

The July 27, 2004 [] Board minutes reveal that a motion was made by Defendant [Janet] Virgin (hereinafter "Virgin") [and] seconded by Defendant [Donna] Younkin to terminate [Plaintiff's] employment as secretary to the Board of Directors, effective immediately. All the individually named Defendants voted in favor of the motion. Other Board members, Dean Frazee (hereinafter "Frazee"),

---

[1]The following quoted facts are compiled from the submissions of proposed undisputed statements of material fact provided by the parties. Proposed facts that are not reproduced herein have been excluded by the Court because they were properly contested by the opposing party, or if the proposed facts were not contested by the opposing party, but still excluded by the Court, they have been found to be immaterial to the issues of the case *sub judice*. Certain facts have been modified because they were misquoted as cited or the accompanying citation did not support the proposed fact.

2

Michael Diehl (hereinafter "Diehl") and Dave Wass (hereinafter "Wass") voted against the motion. Since the vote was five to three, the motion carried. Prior to this motion, during the same meeting, a motion has been made by [] Younkin and seconded by [] Virgin to delegate to the School Board President, Defendant [James] Durkos (hereinafter "Durkos") ...[the investigation of] the performance of Superintendent Keefer, the Plaintiff's husband. The Board President was authorized to consult with and utilize the services of special legal counsel in connection with the investigation.

[An] issue with the cafeteria food purchases was brought to Plaintiff's attention in the fall of 2003 when she saw Deal carry food out of the cafeteria. During the course of her employment as the School Board secretary, Plaintiff became aware of the fact that []Deal [] had required the school cafeteria manager to provide [] Deal with food from the School cafeteria for non-school activities and had used School District personnel and resources for non-school purposes. Plaintiff was concerned whether or not the food was being paid for and she was also concerned that the School District "is basically not a Sam's Club." As a tax free entity Plaintiff was concerned that the school would be in jeopardy of losing state or federal funds if wrongdoing was [][occurring]. Plaintiff has no evidence that Deal took any food without purchasing it.

Plaintiff [has] no evidence that Deal ever obtained food from the cafeteria for anyone other than her church groups. Plaintiff had no knowledge [at the time of her deposition] that the School District's status for state or federal fund has ever been jeopardized. Plaintiff has alleged that the funding for the school cafeteria was generated by local, state and federal tax dollars, and that the Defendant Deal had no authority to requisition food or School District resources for her own non-school purposes. On November 13, 2003, the Plaintiff brought the matter of the requisitioning of school resources to the

3

attention of the Auditor General of the Commonwealth of Pennsylvania due to the fact that an audit was ongoing at the School District at that time. In [the letter written to the Auditor General of Pennsylvania], Plaintiff alleged "possible conversion of school funds through the school cafeteria." Plaintiff claimed that [Defendant Mary Ellen] Deal (hereinafter "Deal") had been requiring the cafeteria manager "to order items for her private use through cafeteria vendors on a number of occasions." Plaintiff stated in said letter that she did not know whether the school was compensated for the items or whether [] Deal simply took the items without compensating the school. Plaintiff further wrote that "in any event, even if the school district is compensated, obviously no taxes would be paid on the items purchased through the school by the school board member, since the school does not pay taxes, as a tax exempt entity." Plaintiff informed the Auditor General that the food [] Deal had been [][obtaining through the school] was for church spaghetti dinners. Plaintiff also stated that it was her personal belief that "there may be more individuals than just [] Deal who receive free or untaxed food through the school cafeteria for non-school uses."

Plaintiff's letter to the Auditor General was written nine days after the November election. In 2003 the election [][was held] on November 4, 2003. After the election, Plaintiff became concerned about her husband's job. Plaintiff became concerned that new Board members who had been elected in November of 2003 such as [] Durkos, Younkin and Virgin would have a tendency to vote with [] Deal. Deal had been on the Board prior to 2003. Plaintiff had been under the belief that because Deal had been elected to the Board, [] Deal had a desire to retaliate against her husband. As early as December of 2003, Plaintiff heard from several individuals in the community that the Board intended to fire her. At that time, Plaintiff believed that Deal wanted to fire her because "she's evil," and because

4

she believed that Deal would do anything in her power to hurt her husband. Plaintiff told school Solicitor Sam Clapper[2] (hereinafter "Solicitor") about her concerns and said "they can't do that." The Solicitor told [the Plaintiff] that they could. Plaintiff spoke with her attorney, Robert Ging (hereinafter "Attorney Ging") before writing the November 13, 2003 letter to the Auditor General. Plaintiff did not show it to anyone other than possibly her attorney before she mailed it. After she mailed it, Plaintiff gave a copy to [] Diehl. Her husband also probably saw the letter. Plaintiff has no knowledge that her husband showed the letter to anyone else.

At a Board meeting held on November 10, 2003, outgoing Board member Richard Edmunds (hereinafter "Edmunds") advised the Board that he had received information regarding cafeteria food purchases for individuals and/or groups in the community. Edmunds stated that the Board should adopt a policy about said purchases and that an investigation needed to be conducted. Notably, the minutes of that meeting were taken by Plaintiff, who was secretary to the Board at that time. Plaintiff had spoken to Edmunds about this matter prior to the November 10, 2003 Board meeting. [Plaintiff] testified that she initially discussed [] Deal obtaining food from the cafeteria with [] Edmunds []. This occurred subsequent to her seeing [] Deal carrying food out of the cafeteria. Plaintiff had also spoken with Board member [] Diehl prior to the meeting. Diehl told Plaintiff that he knew that [] Deal had been making purchases from the cafeteria and that some of the cafeteria workers also ordered food directly from the suppliers. [Plaintiff] testified that she met personally with Carla Sabeck from the Auditor General's office to discuss the concerns about [] Deal obtaining food from the cafeteria. [Plaintiff]

---

[2]The following is a proposed undisputed material fact accepted by the Court: "Mr. Clapper was the solicitor for the school district, and Mr. Durkos was the school board president at the time."

discussed the matter with her husband who is the Superintendent of the school district, and believes that he [also] broached the matter with [] Carla Sabeck. [Plaintiff] testified that when she discussed the matter of []Deal obtaining food from the cafeteria with[] Edmunds, she believed that her husband and Board member [] Diehl were also present. She also testified that she had a separate conversation with [] Diehl about the practice of []Deal obtaining food from the cafeteria. [Plaintiff] advised [] Diehl that she felt that the practice of allowing [] Deal to obtain food from the cafeteria should be stopped and that he as a [] Board member should do something about it.

[Plaintiff] testified that she was concerned about [] Deal taking food from the cafeteria, because she was concerned that the school could lose funds from the state or federal government. [Plaintiff] was concerned about how the practice of passing out food to people in the community would look to the State Auditors.

After the Board meeting, Plaintiff discussed with Edmunds the fact that she could not believe the Board did [not][3] have any comments about the matter. Within a few weeks of the November 10, 2003 Board meeting, Plaintiff told Diehl that she had filed a complaint with the Auditor General against [] Deal[][;] she alleges that she gave him a copy of the letter at that time.[4] [] Plaintiff believes that [] Diehl just does not remember [Plaintiff's] letter to the Auditor General. [Plaintiff] testified that on subsequent occasions she also discussed the practice of []Deal obtaining food from the cafeteria with Vince Smith (hereinafter "Smith") , another Board member. [Plaintiff] also advised []Smith that she

---

[3]Omitted in the Defendants' proposed statement.

[4]The following proposed material fact was excluded because it was repetitive of the present fact: "[Plaintiff] testified that after her initial discussion with [] Edmunds about the cafeteria issue that she advised Board member [] Diehl that she filed a complaint with the Auditor General and gave him a copy of the Complaint or letter."

sent a letter to [the Auditor General] and that the response was copied to the Ethics Commission. [Plaintiff] advised [] Diehl and [] Smith about the investigation so as to alert them about the fact of the investigation.

Each of the individual Defendants has testified that ...[he or she] had no knowledge [Plaintiff] had reported []Deal's cafeteria food purchases to the Auditor General or anyone else. The Auditor General responded to Plaintiff's November 13, 2003 letter in a letter dated November 24, 2003 stating that the auditors would review cafeteria operations in the next regular audit. Thereafter, on December 5, 2003 [Attorney Ging] responded to said letter on her behalf asking that its decision be reconsidered. On January 15, 2004, the Auditor General's office advised Attorney Ging that Plaintiff's husband had previously informed the auditors of this cafeteria food issue and that the auditors had decided that they would not look into it any further because there was no applicable policy. However, based upon Plaintiff's November 13, 2003 letter, the Auditor General's office stated it would review the issue in the next audit. Attorney Ging was also advised that a copy of Plaintiff's letter had been forwarded to the state Ethics Commission for consideration.

Plaintiff believes that she told [Smith] in January that she had written a letter to the Auditor [General] who had responded and copied the Ethics Commission. Plaintiff acknowledges that [] Smith has testified he had no knowledge as to who caused [] Deal to be investigated. Plaintiff believes that [] Smith does not recall their conversation. Plaintiff has no reason to believe that [] Smith told anyone about their conversation. Similarly, Plaintiff does not know whether [] Diehl told anyone that she had written a letter or ...[whether] he had showed it to anyone. Plaintiff did not speak to any other Board member about her complaint to the Auditor General.

7

Plaintiff believes that [] Durkos knew that she had made the complaint because he knew there was a state ethics investigation going on. The basis for Plaintiff's belief that [] Durkos knew about an investigation is that "it is a small town, people talk, and you can't hardly go to the bathroom without people knowing about it." In addition [] Durkos [] received a document request for information on the cafeteria purchases from Attorney Ging and [] Durkos possibly was aware that there had been an Ethics Commission investigation prior to the night [Plaintiff] was fired. He [also] knew that [Plaintiff] worked for Attorney Ging. Plaintiff had heard in the community that people knew there was an ethics investigation going on. Plaintiff's belief is also based on the fact that her attorney had requested information from the school district about cafeteria purchases under the Right to Know Act. Plaintiff heard from [] Diehl "that they thought the investigation started from [Attorney Ging's] office because he had requested information" [] Diehl has testified that he could have heard that from anyone, including the Defendants and that one of the board members suggested the investigation began in Attorney Ging's office, but he could not recall which board member it was. Plaintiff believes that Durkos should have known that it was she who was behind an information request in [Attorney] Ging's May 21, 2004 letter because Durkos knew that she worked for Attorney Ging. Plaintiff acknowledges that her attorney has made other document requests to Durkos on her husband's behalf that had nothing to do with her except that she is married to her husband.

Plaintiff believes that [] Deal knew she reported her to the Ethics Commission because, "I am sure she knew that [Attorney Ging] requested public documents related to the cafeteria and because the community knew there was an ethics investigation going on about her." Deal had testified that she didn't know of Attorney Ging's request for said documents. Plaintiff acknowledges that she does not

believe Deal knew Plaintiff reported her to the Auditor General, but that she reported her to the Ethics Commission. Again Plaintiff believes that Deal should have connected her to Attorney Ging's May 21, 2004 letter because she worked for Attorney Ging. Plaintiff admits however that at the time of said record request her husband was under investigation by the School Board. In fact, the Board had authorized said investigation of Plaintiff's husband as of April 21, 2004. [Plaintiff alleges that] at a meeting held April 21, 2004 Superintendent Keefer was instructed by [] Durkos and the other named Defendants to falsify documents which [] Durkos intended to submit to the Pennsylvania Department of Education. It was well known that Attorney Ging represented Plaintiff's husband. Plaintiff acknowledges that it would [be] equally as plausible for someone to assume that Attorney Ging had written said request on behalf of her husband if in fact he had been writing it on behalf of anyone. At this time there was tension between Plaintiff's husband and the majority of the Board and Attorney Ging openly represented to the Board that he represented Plaintiff's husband. Plaintiff never made it publicly known that Attorney Ging represented her. Plaintiff believes that [] Younkin knew about her complaint against [] Deal to the Auditor General or Ethics Commission at the time of her termination "because she speaks with Mary Ellen." Similarly, Plaintiff believes that [] Virgin knew that she had reported [] Deal to the Auditor General because she believes Deal told her. Plaintiff does not know of anyone who ever heard [] Deal tell anyone that [Plaintiff] ever started any investigation against her.

Plaintiff has admitted that she does not believe Saralane Raboci (hereinafter "Raboci") knew that she had made a complaint against [] Deal at the time she voted to terminate [Plaintiff's] employment. Plaintiff believes that [] Frazee knew she was behind the Ethics Commission investigation into [] Deal at the time of Plaintiff's termination because she believes "Mary Ellen probably told his

9

wife." Plaintiff believes that Wass knew about the Ethics Commission investigation because a lot of people "hangout in" his public gas station.

The Ethics Commission did not find any wrongdoing.

Plaintiff has no information concerning Deal's cafeteria food purchases other than what [the] Solicitor provided to Attorney Ging in June 2004.

Plaintiff has no evidence that anyone talked about the Ethics Commission investigation or the fact that she was behind the Complaint. [Plaintiff] testified that she believed that her husband told [the] Solicitor] about the Ethics Commission investigation of [] Deal, and that [the Solicitor] would have related this to [] Durkos. Plaintiff believes that the Solicitor [] would have told Durkos that she had made the complaint against [] Deal because her husband allegedly [] told [the Solicitor]. "In normal, human nature, [Durkos] probably would have asked him why it came up that [Attorney Ging] was requesting documents on the cafeteria." Plaintiff has no evidence that [the] Solicitor told anyone about that alleged conversation. Plaintiff has heard from [] Smith and [] Deal that [] Durkos said that counsel had recommended she be fired and that it was a conflict of interest to keep her on as Board Secretary because she was married to the Superintendent and [] she worked for [Attorney] Ging who represented the Superintendent. Plaintiff also acknowledges that Durkos may have had other reasons to terminate her such as the accusations made against him in Exhibit 10 to the Plaintiff's Complaint. [The] Solicitor [] advised the Board President in December, 2003 that [Plaintiff] served at-will and could be fired for any reason or no reason at all.

At [the] special meeting held on July 27, 2004 the Defendants read a previously prepared motion to terminate the Plaintiff as the Board secretary immediately. [Plaintiff] was aware prior to the July 27th

10

meeting that she would be terminated at that meeting, due to the fact that [] Durkos called her husband to schedule a special meeting. While attempting to schedule the meeting, [Plaintiff's] husband spoke with board member [] Diehl, who advised Mr. Keefer that [] Durkos intended to fire his wife at the July 27th meeting. [Plaintiff] also spoke with [] Smith who told her that [] Durkos was going to fire her at the meeting. There was no substantive discussion about the termination in either executive session or the public meeting, although it appeared that [] Durkos had consulted an attorney who advised him that no reason was needed to terminate a school board secretary. The Plaintiff has alleged that she believes the individual[ly] named Defendants were aware of her complaints to the Auditor General and the Ethics Commission investigation, that as a result, *inter alia*, of her reporting waste and wrongdoing by school district members and school district personnel to the Auditor General that the named Defendants retaliated against her by terminating her without a valid reason. The Plaintiff has alleged that she believes the named Defendants retaliated against her as a result of their frustration and an inability to terminate her husband from his position as Superintendent of Schools.

Plaintiff has alleged that the named Defendants met privately, individually, and collectively, and conspired against her to violate her Constitutional rights in retaliation for her reporting waste and misuse of school resources by members of the School Board. Plaintiff alleged that the Defendants met on more than one occasion in violation of the Sunshine Act in furtherance of their conspiracy. She alleged that as a result of the actions of the individual Defendants, taken in their capacity as elected officials of the School District for reasons unrelated to any legitimate government functions the Plaintiff had been terminated from her employment and would be deprived the benefit of her wages and other benefits. [Plaintiff] testified that she had asked her counsel to attend the July 27, 2004 school board meeting

11

where she was terminated due to the fact that she became aware prior to the meeting that the school board intended to fire her.

[Plaintiff] testified that there was no substantive discussion about terminating her in executive session, based upon discussions she had with board members [] Wass and [] Diehl. Additionally, she was aware that [] Wass was concerned about her being terminated, and that [] Durkos would not discuss the reason for the termination. [Plaintiff] testified that [] Diehl advised her of [] Durkos' statements during executive session, and that among other reasons for firing her was the request that had been made for information on the cafeteria. [Plaintiff] testified there was no discussion in the public session on July 27, 2004 about her termination. [Plaintiff] also testified that she overheard Mike Saturday, the school principal tell a candidate for the teacher's position who was present at the July 27, 2004 meeting that the Board was going to fire Mrs. Keefer.

Members of the [] Board were aware that the Board was going to terminate [the Plaintiff] prior to the July 27, 2004 meeting. []Frazee testified at his deposition that [Plaintiff] was going to be fired prior to the board meeting based on a conversation with [] Durkos several days before the meeting. [] Wass testified at his deposition that it appeared to him that members of the board had made up their minds to terminate [the Plaintiff] prior to the July 27, 2004 meeting. He also testified that it appeared that [] Deal, [] Younkin, [] Virgin and [] Durkos had discussed [the Plaintiff's] termination prior to the executive session. Some of the Defendants deny having discussions outside of the [Board] meeting, others admit it. [] Smith testified at his deposition that [] Durkos contacted some of his neighbors about replacing [the Plaintiff] as board secretary, prior to the July 27th meeting. [] Diehl testified at his deposition that [] Virgin read a prepared motion to terminate [the Plaintiff] at the July 27, 2004 meeting.

12

[] Diehl indicated that he was aware that [] Durkos had contacted Mrs. Garland to take [the Plaintiff's] position as the Board secretary prior to the motion being made. Durkos testified that he did have discussions with Bridget Garland regarding her taking [Plaintiff's] job prior to the night when [Plaintiff] was terminated.

[Plaintiff] testified that she was terminated in retaliation for asking questions about []Deal and filing a complaint against her. [Plaintiff] believed that the Board fired her because members of the Board were very vindictive people. [Plaintiff] testified that she believed that Board members Durkos, Virgin, Younkin and Deal were friends, and that it was logical that these individuals would be upset with her for filing a complaint with the Auditor General.

[Plaintiff] testified that she believed that [] Durkos knew that she had reported [] Deal to the Auditor General and/or Ethics Commission in July of 2004. The basis of this belief arose out of the fact that [] Durkos was aware that [Plaintiff] worked for Attorney Ging, and knew that Attorney Ging had requested information directly from [] Durkos regarding the cafeteria food acquisitions. [] Durkos testified at his deposition that he received a document request for information on the cafeteria purchases from Attorney Ging. [Plaintiff] heard from other members of the community that []Deal was being investigated for obtaining food for her church. [Plaintiff] was aware from discussions with [] Diehl that the Board believed the investigation started from Attorney Ging's office because he had requested the information from [] Durkos. [Plaintiff] testified that she had a conversation with [] Diehl, who stated that he had been interviewed in the investigation of [] Deal, and [] Diehl told [Plaintiff] that he thought the investigation was commenced in her attorney's office. [Plaintiff] testified that Durkos was aware she worked for [Attorney] Ging, and he likely knew that [Attorney] Ging got the information

13

regarding [] Deal obtaining food from the cafeteria from [Plaintiff]. [Plaintiff] believed that [] Durkos was aware that the Right-to-Know Act request for cafeteria records had something to do with her. [Plaintiff] believed that [] Deal also knew about her being the source of the Ethics Act Commission, due to the fact that Attorney Ging had requested public documents related to the cafeteria, and because the community was generally aware that there was an Ethics Act investigation [being conducted which involved] [] Deal [].

[Plaintiff] was also asked by [Attorney] Monahan whether or not the "investigation' of her husband was still ongoing, and she testified that the "investigation" did not go forward. [Plaintiff] believed, based upon her personal knowledge of [] Deal that she most likely discussed the Ethics Act investigation with other members of the community, other [Board] members, and the cafeteria manager, Deb Frazee, whose husband was also a [Board] member. [Plaintiff] testified that in addition to queries of [] Edmunds and [] Diehl she also queried Norma Glover, a school district employee about the cafeteria food practices.

[Plaintiff] testified that she was aware that since she filed her complaint with the Auditor General that the cafeteria purchases by school board members had stopped.

Diehl also testified that he heard one of the Defendants state that [][he or she] thought the investigation by the Ethics Commission had originated in Attorney Ging's office. [] Raboci testified at her deposition that she became aware of the Ethics Commission's investigation of []Deal prior to [Plaintiff] being fired. [] Raboci testified that []Deal told the members of the [Board] at an executive session in June, 2004 that she had been investigated by the Ethics Commission. [] Raboci had been interviewed by the Ethics Commission about [] Deal's acquisitions from the school cafeteria. []

14

Younkin testified at her deposition that she had a conversation with [] Virgin and Durkos "on the street" about firing [Plaintiff] prior to the Board meeting. [] Deal testified at her deposition that she had advised Mrs. Frazee, the cafeteria manager and wife of Board member [] Frazee, that she received a letter from the Ethics Commission. [] Deal was advised by Mrs. Frazee that there was a complaint about her practice of obtaining food, and an investigation, and that the Solicitor had asked for documents. [] Deal also testified that in addition to advising Mrs. Frazee of the Ethics Act investigation she also discussed it with [] Durkos and [] Raboci at a Board meeting.

Durkos testified that there was no discussion about firing [Plaintiff] in executive session. Durkos testified that he "might" have been aware of the Ethics Commission letter regarding [] Deal prior to the night [Plaintiff] was fired. He also knew that documents relating to the school district cafeteria and [] Deal had been requested by Attorney Ging's office, and knew that [Plaintiff] worked for Attorney Ging.

[] Frazee testified at his deposition that the only discussion about terminating [Plaintiff] of which he was aware occurred in executive session, and [] Durkos advised the Board that "private counsel" had recommended that [Plaintiff] [] be terminated. He recalled no other discussion about her termination.

[]Wass testified that there had never been any discussion of terminating [Plaintiff] prior to the meeting on July 27, 2004, and that he was aware that one or more Board members wanted to terminate [Plaintiff] for "conflicts of interest" and did not recall who raised the "conflict of interest." There was no discussion of what the "conflict of interest" was. [] Wass was never given a satisfactory answer by Durkos or other Board members as to what the "conflict of interest" was. He testified that it appeared

15

some of the Board members had already made up their mind as to terminating [Plaintiff].

[] Diehl testified that it was Durkos who believed there was a "conflict of interest" in [Plaintiff] working for the school board. [] Virgin responded to Plaintiff's Interrogatories directed to her that [Plaintiff] was terminated because it was perceived that the [Board's] "investigation" of her husband could be impeded by [Plaintiff] being the school board secretary, and that she had previously exhibited conduct in recording the minutes of the meeting that evidenced lack of impartiality. []Virgin testified at her deposition that she wasn't concerned about a "conflict of interest," and in fact never saw a conflict of interest with [Plaintiff] .

[] Raboci testified that she did not know why the other [] Board members fired [Plaintiff], and that there was only a vague discussion. She recalls that [] Durkos had spoken to an attorney [who advised] that because of the "investigation" it was time to do something about the []Board secretary. [] Raboci said no one could really identify what the "conflict of interest" was, or what papers [Plaintiff] might have access to that weren't public record. [] Raboci, although concerned about a potential conflict of interest between a husband and wife, wasn't aware that [] Frazee, a [] Board member [,] had a wife who ran the cafeteria, two daughters who teach at the school, and a son who coached at the school.

[]Younkin testified that [Plaintiff] was fired because she spoke up at a Board meeting about additional work being given to [Plaintiff's]husband. She also indicated she believes that there were things that came up in the minutes that were "not worded to the recollection of the person speaking the words."

[] Deal testified that although [Plaintiff] was fired as a result of a "conflict of interest" it was

16

[] Durkos who determined that it was a "conflict of interest" based upon his discussion with "legal counsel." The "conflict of interest" was having [Plaintiff] as a secretary due to her husband who was the Superintendent being "investigated." [] Deal was not sure who was investigating Mr. Keefer, or what he was being investigated for. She did not know who was doing the investigation, and although she voted to investigate the Superintendent she did not know why she voted to investigate him, and had never heard of any wrongdoing by the Superintendent. She felt that the "conflict of interest" was that it would put [Plaintiff] in an awkward position if somebody asked her for documents. No ever explained to her what the conflict was other than the fact that someone might ask [Plaintiff] for documents.

[] Durkos testified at his deposition that the reason he made [Plaintiff's] position an agenda item on July 27, 2004 was because the minutes had not been approved in a timely manner. He indicated that there were questions about the accuracy of the minutes, however he listened to the tapes of the meetings to verify the accuracy of the minutes and the tapes reflected what the minutes reflected. []Durkos testified that the reason[s] he placed [Plaintiff's] position on the agenda [were][] a lack of trust and the Board secretary's inability to separate her personal feelings from her professional duties as Board secretary. The lack of trust [resulted from the fact] that she was married to the school Superintendent although [] Durkos didn't say he did not trust [Plaintiff]. He also indicated that he was unaware of any member of the board who didn't trust her. [][Regarding Plaintiff's] inability to separate her personal feelings from her professional duties Durkos could recall an instance where [Plaintiff] was upset because Mr. Keefer was being directed to take over the administrative duties of the elementary principal, without getting paid for it. Durkos cited as the only other example of [Plaintiff] not being able to

17

separate her personal life from her position as Board secretary a comment that she made about "leaving education to the educators." [Plaintiff] has a child in the school district, however [] Durkos felt that the criticism was inappropriate. [][W]ith only these two instances of her inability to separate her personal life from her job, [] Durkos offered [Plaintiff's] position to Bridget Garland.

Garland, also a secretary at the school, read a letter at a school board meeting criticizing the Board for how bad it was. Despite the fact that Mrs. Garland had called the school board a bunch of hicks and hillbillies [] Durkos was not offended by that statement because it was not made while she was board secretary. Durkos admitted that he was at the board meeting on June 30, 2003 when Mrs. Garland addressed the board. He was at the meeting when Mrs. Garland stated that the board should be ashamed of itself, that she found the Board members disgusting and told them they were nothing but a bunch of hillbillies and hicks and that she would deal with Mr. Keefer on her own time. Despite the fact that [] Durkos later offered Mrs. Garland [Plaintiff's] job, he indicated he was not aware that she was an employee of the school district at the time she made the defamatory statements about the Board. [] Durkos was more offended by [Plaintiff] stating that "education should be left to the educators" than he was by Mrs. Garland calling school board hicks and hillbillies and telling them that they should get out into the real world.

[] Durkos testified that the board never reprimanded [Plaintiff] either in executive session or publicly, that overall [Plaintiff] did a good job as Board secretary, and indicated that all of the minutes of meetings which the Board was concerned about were actually approved by the Board after members listened to the tapes. The Board never determined that [Plaintiff] had omitted anything from the minutes.

18

## II. Analysis

### A.  Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) reads in pertinent part: "The [summary] judgment sought

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to a judgment as a matter of law."

> "Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91
> L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine
> 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving
> party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91
> L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all
> reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And
> Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> "As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller,
> & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality
> inquiry is independent of and separate from the question of the incorporation of the
> evidentiary standard into the summary judgment determination. That is, while the
> materiality determination rests on the substantive law, it is the substantive law's
> identification of which facts are critical and which facts are irrelevant that governs. Any
> proof or evidentiary requirements imposed by the substantive law are not germane to
> this inquiry, since materiality is only a criterion for categorizing factual disputes in their
> relation to the legal elements of the claim and not a criterion for evaluating the
> evidentiary underpinnings of those disputes."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## B. Count I: Pennsylvania Whistleblower Act Claim

The Defendants argue for dismissal of Count I, which alleges a violation of the Pennsylvania Whistleblower Law by the Defendants, based upon the fact that they believe the Plaintiff only voiced *suspicions of wrongdoing* to the Auditor General, and not actual violations of federal, state or local law. Defendants' Brief (Document No. 75) p. 3. The Plaintiff counter-argues that she reported wrongdoing that amounted to theft by unlawful taking or disposition (*see* 18 Pa.C.S.A. § 3921), as there is no proof the food taken was paid for or permitted to be taken by the Board. Plaintiff's Brief (Document No. 82), pp. 4-5. The Plaintiff further cites to the fact that Deal did not provide receipts for the food she allegedly purchased from the District when so requested during discovery. Plaintiff's Brief, pp. 5-6. Plaintiff also argues that Deal's acts could be a violation of the Pennsylvania Ethics Act through exercising improper influence, *see* 65 Pa.C.S.A. § 1103, and that the report of wrongdoing to the Auditor General, who is charged with " the power and duty to audit accounts and records of every school district within the Commonwealth," was a reporting to the proper state official. Plaintiff's Brief, pp. 6-7. Finally the Plaintiff opposes the application of the case of *Riggio v. Burns*, 711 A.2d 497 (Pa. Super. 1998), to the present summary judgment motion by arguing that the Plaintiff's report of wrongdoing or waste was reported to the correct state official. Plaintiff's Brief, pp. 7-8. The Court agrees with the Defendants that summary judgment must be granted as to this count.

Pennsylvania's Whistleblower Law states in pertinent part:
    No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

20

43 P.S. § 1423(a). "Wrongdoing" is defined under the statute as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public of the employer." 43 P.S. § 1422. "Waste" is defined under the statute as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 P.S. § 1422. "Good faith report" is defined under the statute as "a report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." 43 P.S. § 1422.

Although the Plaintiff discounts the application of *Golaschevsky v. Dep't of Environmental Resources*, 683 A.2d 1299 (Pa. Commw. 1996), *aff'd by Golaschevsky v. Dep't of Environmental Resources,* 720 A.2d 757 (Pa. 1998), the Court believes it to be on point, particularly at this summary judgment stage.

In *Golaschevsky*, the plaintiff, who worked as a "Computer Systems Analyst I" for the Defendant, filed an action under the Pennsylvania Whistleblower Statute in the Commonwealth Court claiming a violation of that statute as a result of his termination following his "good faith" reporting of suspected violations of federal copyright laws by fellow employees' use of computer software. *Golaschevsky* at 1300-1301. In granting summary judgment, the Commonwealth Court found no genuine issue of material fact under Pennsylvania law stating:

> Golaschevsky told his employer that he suspected violations of copyright law based upon his personal observations at the DMO offices and conversations with employees with respect to compliance with copyright laws. DEP asserts that the

21

information was "innuendo and conjecture," and that Golaschevsky had no proof of violations of law, merely suspicions. DEP specifically notes that a supervisor, Ms. Ronemus, encouraged him to submit a list of the alleged illegal computer uses which Golaschevsky did not do. Where suspicion triggers a report of waste or wrongdoing, the employee has made a report within the meaning of the Whistleblower Law. *Lutz v. Springettsbury Township*, 667 A.2d 251 (Pa. Commw. 1995). However, a mere report of alleged wrongdoing is not "credible evidence." Golaschevsky was certainly in a position to substantiate illegal computer use by various means, *i.e.*, confiscation, photographing, but Golaschevsky failed to produce evidence of any alleged illegal computer use.

*Golaschevsky* at 1302.[5]

The Plaintiff in the case *sub judice* had failed to produce evidence of illegal activity. The record reveals that the correspondence sent by the Plaintiff to the Auditor General expressed doubt on the Plaintiff's part as to whether the school district was compensated for items given to Deal, and even if compensation was made, a belief that purchasing untaxed food is a "procedure [that] is wrong, and deprives our students of the benefits that state and federal funds, if any, are supposed to be providing to them for school meals." Complaint, Exhibit 2, p. 1. The Plaintiff indicates that the amount of the "conversion of school property" is unknown, but she believes it "improper and possibly illegal." *Id.* at p. 2. However, the Defendants have challenged the idea that any illegal activities took place, and indeed, the record before the Court does not contain any evidence of illegal activity, only revelations made by the Plaintiff to state authorities that she believed the acts of Deal were illegal. Although she references the Pennsylvania Crimes Code and the Ethics Act and argues that the Defendant has not produced receipts for any food taken by Deal from the cafeteria, the Plaintiff's reference to the absence

---

[5]*Golashcevsky* was affirmed by the Pennsylvania Supreme Court, but the issue of Golaschevsky's failure to produce evidence of illegal acts was not in issue; the Pennsylvania Supreme Court affirmed finding that no causal connection was established by Golaschevsky between his report to superiors of suspected copyright violations and his subsequent termination. *Golaschevsky v. Dep't of Environmental Protection*, 720 A.2d 757, 759-760 (Pa. 1998).

of evidence in the record that would establish that Deal's actions were legal does not equate to the conclusion that Deal must have committed a crime.

The absence of evidence in the record that would indicate "wrongdoing" or "waste" under the statute favors the Defendants' position. The Plaintiff, in countering the Defendants' motion, must establish that there is a genuine issue of material fact for trial and, specifically for this count concerning the Pennsylvania Whistleblower Law, the Plaintiff must establish that she has evidence that she reported "wrongdoing" (a violation Federal, state, local laws, regulations, ordinances or codes) or "waste" ("substantial abuse, misuse, loss or destruction of funds or resources") (43 P.S. § 1422) because the Defendants argue that such evidence does not exist. The Plaintiff's failure to produce evidence of record supporting the fact that "wrongdoing" or "waste" was even reported results in a failure to prove a key element under the Pennsylvania Whistleblower Law, that is a protected action taken by the Plaintiff which the Defendants retaliated against. *See* 43 P.S. § 1423. The record before the Court only reveals through the Solicitor's correspondence[6], Defendants' Appendix (Document No. 72), Exhibit S, and Deal's testimony at the time of deposition that Deal was the only school board member who ordered food through the cafeteria and that Deal purchased such food. Deal's deposition, which indicates that she bought items through the cafeteria, that she may have still possessed some receipts from those transactions and that she paid taxes on some items she ordered, has not been countered by any other evidence in the record, thus the Court can accept her testimony without having to resolve an

---

[6]Although the correspondence from the Solicitor includes hearsay of the cafeteria manager, such evidence is admissible for purposes of summary judgment as it can be admitted at trial through the cafeteria manager's testimony. *See Shelton v. University of Medicine and Dentistry of New Jersey*, 223 F.3d 220, 223 n. 2 (3d Cir. 2000); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1234, n. 9 (3d Cir 1993).

issue of credibility as to the question of whether she properly purchased items or took items from the cafeteria without paying for them. Plaintiff's Brief (Document No. 82), Exhibit 8, pp. 15-16. Although the Plaintiff's counsel made an oral request at the time of Deal's deposition for receipts given to Deal for food alleged purchased by her from the school cafeteria, evidence of such receipts is not present in the record before the Court and no motion to compel such receipts was filed by the Plaintiff.

It is also clear from the record that no school district policy was violated as no policy prohibiting such actions was in place. Because the Plaintiff has failed to refute, through references to the record, the Defendants' observation of the absence of evidence in the record demonstrating that the Plaintiff reported a violation of Federal, state or local law, regulations, ordinances or codes, *i.e.* "wrongdoing" or a "substantial abuse, misuse, destruction or loss of funds or resources", 43 P.S. § 1422, *i.e.* "waste" by Deal or any others, summary judgment must be granted for the Defendants on this count.

The Defendants have also moved for summary judgment as to Count I on the alternative argument that no evidence of causation has been produced by the Plaintiff demonstrating that her termination as Board secretary was caused by her reporting of Deal's activities with regard to school cafeteria food to the Auditor General, who then referred this matter to the State Ethics Commission. The undisputed facts demonstrate that the Defendants were aware of the Ethics Commission investigation because Deal had told the members of the [Board] of the fact that she was investigated and one of the Defendants, although his/her name is unknown, believed the investigation "originated from Attorney Ging's office" and that Durkos had received a request for public information from Attorney Ging regarding the purchases made from the cafeteria. It is also recognized, as the Plaintiff has pointed out, that it was known by Durkos that the Plaintiff worked for Attorney Ging, and the

24

discussions among the Defendants regarding the subject of terminating the Plaintiff's employment occurred prior to the July 27, 2004 meeting.

It is clear that Pennsylvania law requires the establishment of a causal connection between a termination and the reporting of a wrongdoing or waste in order to make out a *prima facie* case for a violation of the Whistleblower Law. *See Golaschevsky*, 720 A.2d 757, 759-760 (Pa. 1998). While it is clear that the Plaintiff as non-movant in summary judgment proceedings is entitled to have all inferences drawn in her favor, it has been recognized that inferences based upon speculation do not create genuine issues of material fact. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382, n. 12 (3d Cir. 1990). The Court also recognizes that when the moving party "exclusively" controls "the knowledge of the events or occurrences on which the action is based" an issue of credibility is presented. 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2726 (3d ed. 1998). However, the Court concludes that it has been presented with all of the material facts in regard to the case *sub judice*. Thus, the Court considers the Plaintiff's lack of knowledge, particularly as to the events of the executive session of the school board in which the decision was made to terminate her, as a factor to be weighed with the other circumstances and material facts known in this matter. *Id.* A review of the material facts reveals that two of the Defendants voted to terminate the Plaintiff for what they believed to be a conflict of interest and/or what they perceived to be the failure of the Plaintiff to keep correct minutes of the [Board] meetings, another did not see a conflict of interest, and another thought the Plaintiff was fired for speaking at a Board meeting to complain of extra work given to her husband. Although Plaintiff's termination may appear to have been an irrational action given these reasons or lack thereof, the Court is not presented

with any evidence that the Plaintiff's speculation,[7] that the Defendants could only conclude that the Ethics Commission investigation was initiated by a report of the Plaintiff, was the motivation for her termination. The assumption by Plaintiff that certain circumstances were known to Defendants because people talk in small towns is based upon pure speculation in the case *sub judice*. Furthermore the statement that it was the Plaintiff who was the complainant because she worked for Plaintiff's counsel, who had made a public information request as to purchases made from the school cafeteria, is a statement made by the Plaintiff based upon speculation. The fact remains that no evidence has been presented that establishes that any of the Defendants were aware that the Plaintiff was in fact the person filing a complaint with the Auditor General, a complaint that was later referred to the Ethics Commission.

When a court is presented with credible evidence that is conflicting, and issues of credibility remain, summary judgment should not be entered, but when a non-movant relies upon her "own subjective interpretation of the events" a motion for summary judgment is not properly contested. *Losch v. Borough of Parkesburg, Pa*, 736 F.2d 903, 908-909 (3d Cir. 1984). If anything, the record suggests that the Defendants believed the request from the Plaintiff's counsel was made on behalf of the Plaintiff's husband; Mr. Keefer was the superintendent of the school district and was also represented by Plaintiff's counsel in respect to a separate matter, identified as employee 2004-02 in the summary judgment record, and the records request by Plaintiff's counsel was answered by special counsel who was hired for the purpose of the investigation concerning employee 2004-02. Document

---

[7]The Court notes that many of the material facts, although uncontested by the Defendant, which allege knowledge on the part of the Defendants are based on the testimony of the Plaintiff and her beliefs, not her first-hand knowledge.

No. 82, Exhibit 14; Complaint (Document No. 1) ¶ 35. The only reasonable, permissible inference based upon this fact is that the school board considered the records request as concerning a separate matter that involved the Plaintiff's husband because it referred the records request to the special counsel who was addressing the Plaintiff husband's separate employment matter.[8]

Where a record before the court on a motion for summary judgment presents no genuine issues of material fact, an attempt to question the credibility of a witness will not suffice to defeat the motion, but only affirmative evidence will defeat the motion. *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129-130 (3d Cir. 1998). Although the record presents evidence that the Defendants were aware of an investigation of Deal by the Ethics Commission (Document 82, Exhibit 5, p 53), that the Defendants were aware of the investigation prior to the meeting in which the Plaintiff was fired, the Plaintiff's attorney (who was also the school superintendent's attorney) had made a public record request regarding records that related to the Ethics Commission investigation, and that the Plaintiff worked for Plaintiff's counsel, there is no evidence that the Plaintiff's identity was connected to the request, see Appendix (Document 72), Exhibit O, nor did the Ethics Commission reveal her name as the person making allegations against Deal. Appendix, Exhibit R.

The Plaintiff also cites the fact that she told two Board members, Diehl and Smith, that she made a complaint to the Auditor General, and she specifically told Smith that the response to her complaint was copied by the Auditor General to the Ethics Commission. Smith himself indicated that he did not speak to anyone from the school board before or after being interviewed for the Ethics

---

[8]This matter concerning the Plaintiff's husband the and School Board is not a part of this record and is immaterial to the case *sub judice*.

Commission investigation. Document No. 82, Exhibit 4, p. 64. Diehl cannot recall knowing the Ethics Commission investigation was begun by the Plaintiff prior to the commencement of the present civil action. Document No. 72, Exhibit G, p. 60. The missing link of causation, the Defendants' awareness that the Ethics Commission investigation was initiated through a complaint made by the Plaintiff and referred to the Ethics Commission by the Auditor General, is not present in the evidence. The Plaintiff would have the Court accept the inference that because the Plaintiff worked for Attorney Ging, who had requested public records related to the issue of the subsequent Ethics Commission investigation, that Defendants believed the investigation was started by a complaint made by her. As the Defendants have argued, the record contains no evidence that demonstrates that the Plaintiff was known by the Defendants as the source of the Ethics Commission complaint. The fact is that the request by Attorney Ging could have been made by him on behalf of anyone, including the Plaintiff's husband, as Superintendent, or any other concerned citizen. There is no evidence of record, other than the Plaintiff's speculation, that demonstrates the Defendants were aware of the Plaintiff's reporting of Deal's acts, or could infer that the Plaintiff made such a reporting.

The Plaintiff seeks to survive summary judgment based upon the view that it is a reasonable inference to conclude that the Defendants terminated the Plaintiff because she reported Deal to the Ethics Commission. The inference the Plaintiff wishes the Court to make is based upon speculation, speculation that the Defendants concluded that the Plaintiff made the complaint that initiated the Ethics Commission investigation. Without affirmative evidence that would support the fact that the Defendants believed or knew the Plaintiff reported Deal, it remains a speculative inference on the part of the Plaintiff that does not create a genuine issue of material fact on the causation element of the

28

Plaintiff's Whistleblower Law claim. For these reasons, summary judgment is again granted for the Defendants as to Count I.

Finally, the Defendants argue again in the alternative for the dismissal of Count I based upon the fact that they have presented "separate and legitimate reasons, which are not merely pre-textual" for the Plaintiff's termination. 43 P.S. § 1424(c). The Pennsylvania Supreme Court has found that "to successfully rebut a *prima facie* case of reprisal-the employer must prove that it would have taken the same adverse employment action absent the employee's good faith report or wrongdoing." *O'Rourke v. Commonwealth,* 778 A.2d 1194, 1204 (Pa. 2001).

The Defendants assert that the majority of the Board voted to terminate the Plaintiff because of a conflict of interest. However, the undisputed material facts reveal that only Durkos and Deal voted for the Plaintiff's termination because of a perceived conflict of interest, while Younkin, Raboci and Virgin, who cast the remaining votes for termination of the Plaintiff, respectively revealed the following: Younkin believed the Plaintiff was fired because she spoke at a Board meeting objecting to additional work being given to her husband, Raboci did not know why the Plaintiff was fired, and Virgin "never saw a conflict of interest with [Plaintiff]." *See* p. 16, *supra.* Clearly, these board members who voted to approve the Plaintiff's termination did not all vote for termination because of a conflict of interest and a genuine issue of material fact would remain as to the existence of a "separate and legitimate" non-pretextual reason for the termination. Therefore, summary judgment cannot be granted on this argument, but Count I still fails to survive summary judgment because of the analysis above.

## C. Count II-Procedural Due Process Claim

The Defendants argue that this Court's conclusion in its Memorandum Opinion and Order of Court dated April 20, 2005, denying the motion to dismiss Count II, was incorrect. Specifically, they argue that the Pennsylvania Whistleblower Law does not provide any procedural due process protections to the Plaintiff even if her termination was a violation of the Whistleblower Law. Defendants' Brief, p. 8. It is the Defendants' position that the Whistleblower Law "does not afford an at-will employee a property interest in continued employment." *Id.*

The Plaintiff cites to the case of *Weaver v. Harpster*, 885 A.2d 1073 (Pa.Super. 2005) for the proposition that Pennsylvania's law of at-will employment is subject to a public policy exception that protects the Plaintiff's continued employment. Plaintiff's Brief, p. 18.

The Court believes that the position stated in Memorandum Opinion and Order of April 20, 2005 is correct in that the Plaintiff, although an at-will employee, did have an expectation in continued employment to the extent she has protection against retaliation for protected conduct under the Whistleblower Law, and thus could be entitled to the protections of procedural due process. This is consistent with the *Weaver* case cited by the Plaintiff in that an exception exists to the general "at-will" employment law in the Commonwealth of Pennsylvania for purposes of "public policy." *Weaver* at 1076. The Court believes that the Pennsylvania Whistleblower Law creates such a public policy exception to the general rule of law that employment contracts are "at-will" in the state of Pennsylvania. To not follow the public policy of the Whistleblower Law would allow for an "at-will" state or local government employee to be terminated for the good-faith reporting of "wrongdoing" or "waste" within the Commonwealth's governmental bodies and this would clearly frustrate the intent of the

30

Pennsylvania Whistleblower Law. The case of *Smith v. Barnes*, 1995 U.S. Dist. LEXIS 14150 (M.D.Pa. Sept. 25, 1995) cited by the Defendants is inapposite as the plaintiff in that case argued for procedural due process rights based upon the contents of an employee handbook. Nevertheless, the Court finds that the record does not reflect that the Plaintiff was entitled to procedural due process based upon the Pennsylvania Whistleblower Law, which protected her from termination from her public employment for the purpose of retaliation. This is because the record fails to establish any genuine issue of material fact that would support the theory that the Plaintiff was terminated in retaliation for her reporting of Deal to the Auditor General.

The Court reiterates the fact, established through the undisputed material facts set forth earlier in this opinion, that the Plaintiff made her complaint to the Auditor General, not the Ethics Commission, which was then referred this matter by the Auditor General. It was then the Ethics Commission which proceeded to investigate Deal and concluded no basis existed to find a violation of the state ethics laws.

If the record supported a theory that the Plaintiff was terminated for making a report to the Auditor General that, in turn, resulted in an Ethics Commission investigation then procedural due process rights would attach to the Plaintiff's employment. The record does not support such a theory. Accordingly, because the record does not establish a genuine issue of material fact supporting the theory that the Plaintiff was terminated for her reporting of Deal pursuant to the Pennsylvania Whistleblower Law, no matter which state agency received the report, the Plaintiff could be terminated "at-will" without any procedural due process rights existing to protect her employment.

31

## D.     Count III-First Amendment Claim

To establish a claim of retaliatory termination for one's lawful exercise of her freedom of speech under the First Amendment, a public employee must establish 1) that her speech was "protected activity"; and 2) that the protected "speech was a substantial or motivating factor for [her] discharge." *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3d Cir. 1994). Should the Plaintiff establish these two elements, the Defendants may still avoid liability for the Plaintiff's First Amendment claim if they demonstrate that they would have terminated the Plaintiff despite the establishment of the first two elements. *Id.* The parties focus upon what they view as an issue of causation between the Plaintiff's reporting to the Auditor General and her subsequent termination; the Defendants assert that causation is lacking and the Plaintiff disagrees. Clearly, the parties are raising the issue of whether the Plaintiff's "speech was a substantial or motivating factor for [her] discharge." *Id.*

The Court has previously found that the record does not present a genuine issue of material fact as to the Defendant's knowledge of the Plaintiff's speech. The Plaintiff's only manner of linking her speech to the Defendants' alleged knowledge of the speech is through an inference based upon speculation, and this cannot create a genuine issue of material fact. *See Robertson, supra; Part A, supra.* Therefore, summary judgment is granted and Count III is dismissed.

## E.     Qualified Immunity

The Defendants also seek qualified immunity for the Plaintiff's claims of violations of procedural due process and her free speech rights under the First Amendment.

In order to apply the federal law of qualified immunity, the Court must conduct

32

a two part inquiry. "[A] court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399, 405 (1999). In order to be "clearly established", "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). This is an objective, fact-specific inquiry based upon what the defendant knew at the time of his actions and if a reasonable person in the defendant's situation would understand his actions to be violating a clearly established right at that point in time. *Id.* at 640, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523, 531-532.

*Keefer v. Durkos, et al.*, 371 F.Supp.2d 686, 699-700 (W.D.Pa. 2005).

The Court recognizes that qualified immunity is an immunity from suit, not immunity from liability, and while the application of qualified immunity typically occurs prior to discovery, this Court has previously denied its application when presented previously in the posture of a motion to dismiss by the Defendants. *See id. See also Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793-1794, 114 L.Ed.2d 277, 287 (1991)(recognizing that unmeritorious suits should be dismissed before discovery based upon the immunity, or at the very latest, prior to trial) and *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, 425 (1985)(recognizing that application of qualified immunity is proper as early as prior to discovery or as late as after completion of discovery and during summary judgment proceedings). Now, after completion of discovery a more complete picture of the circumstances of this matter and the Plaintiff's accompanying rights leads the Court to conclude that qualified immunity is applicable to the Plaintiff's claims in Counts II (procedural due process claim) and III (First Amendment claim) of her complaint.

33

The Court finds, based upon the analysis above, that the Plaintiff has not established the first prong of the qualified immunity two-part inquiry in that she has failed to allege a "deprivation of an actual constitutional right at all...." *Keefer, supra* (citing *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399, 405 (1999)). The Plaintiff has not established a procedural due process claim as she has not demonstrated that she was a whistleblower under the Pennsylvania Whistleblower Law, which would have established in her a right to continued employment only from retaliatory termination for protected conduct under Pennsylvania's Whistleblower Statute. As for the Plaintiff's First Amendment claim, the Court finds that the record once again does not present a genuine issue of material fact for trial in that the Plaintiff's claims of retaliatory termination cannot be established to have been caused by the Defendants' knowledge of the report to the Auditor General or the Defendants' knowledge of such reporting by the Plaintiff; thus, the evidence does not demonstrate that the Defendants acted against the Plaintiff, with the Plaintiff's speech being a "substantial or motivating factor" for the Defendants' termination of the Plaintiff. Without a deprivation of the Plaintiff's procedural due process and First Amendment rights, qualified immunity is applicable to the Defendants' actions as alleged in Counts II and III.

## F. Absolute Immunity-Tortious Interference with a Contractual Relationship

The Defendants, as individuals, argue for the application of absolute immunity for their decision to terminate the Plaintiff as school board secretary as that act was done in their capacity as members of the school board and the Defendant School Board claims governmental immunity according to the Pennsylvania Political Subdivision Torts Claim Act, 42 Pa. C.S.A. § § 8541-8542. Defendants' Brief, p. 12. Alternatively, the Defendants argue that in the absence of such immunity, the circumstances of

34

the Plaintiff's termination do not demonstrate her termination was "improper." *Id.*

The Plaintiff disagrees and argues that absolute immunity does not extend to intentional torts, such as this one, and also argues that the evidence establishes "that the Plaintiff is a Whistleblower, and engaged in protected conduct, and that the Defendants acted with malice toward the Plaintiff, the Defendants are not entitled to [absolute immunity]." Plaintiff's Brief, pp. 22-23. Plaintiff also argues that the evidence establishes that she has met the criteria of the RESTATEMENT (SECOND) OF TORTS, § 767 to make a claim that the Defendants' actions were improper in interfering with a contractual relationship. *Id.* at 23. The Plaintiff also argues that the Defendants acted with "actual malice and willful misconduct" so as to preclude the invocation of absolute immunity under Pennsylvania's Torts Claim Act. *Id.* at 24.

It is clear that tortious interference with contractual relations is a intentional tort. *See U.S. Healthcare, Inc., et al. v. Blue Cross of Greater Philadelphia et al.*, 898 F.2d 914, 925 (3d Cir. 1990) and *Adler, Barish, Daniels, Levin and Creskoff v. Epstein, et al.*, 393 A.2d 1175, 1183-1184 (Pa. 1978).

Pennsylvania common law provides for absolute privilege for the acts of "high public officials." *See Linder v. Mollan*, 677 A.2d 1194, 1195-1196 (Pa. 1996). The employees of local agencies who are not entitled to the absolute privilege because they are not "high public officials" are entitled to official immunity defined at 42 Pa.C.S.A. §§ 8545-8550.[9] *Linder* at 1196-1197. A school board director qualifies as a "high public official" and thus is entitled to absolute privilege. *Matta v. Burton*, 721 A.2d 1164, 1166, (Pa. Commw. 1998). The absolute privilege applies to claims of defamation, "retaliatory

_____

[9] A state cannot immunize "entities or individuals" against alleged violations of federal laws as such an action would be in violation the supremacy clause of the federal Constitution. *Wade v. City of Pittsburgh*, 765 F.2d 405, 407-408 (3d Cir. 1985)(citations omitted).

discharge, *loss of consortium*, invasion of privacy, and *intentional infliction of emotional distress*." *Zugarek v. Southern Tioga School District*, 214 F.Supp.2d 468, 479 (M.D.Pa. 2002)(emphasis in original). The absolute privilege also extends to claims of intentional interference with contractual relations. *Holt v. Northwest Pa. Training Partners Consortium, Inc.* 694 A.2d 1134, 1139-1140 (Pa. Commw. 1997). Since it is clear that the Defendants, as members of the school board are high public officials, and that the Plaintiff has made a claim of intentional interference with contractual relations for their decision to terminate her, the last question that remains is whether the Defendants' actions were "taken in the course of [their] duties or powers and within the scope of [their] authority,...." *Linder* at 1195 (citation omitted). Clearly, the act of voting for a motion to terminate the employment of the school board secretary, *i.e.* the Plaintiff, who is an "at-will" employee, is within the scope and duties of a school board director. Thus it is evident that the Defendants are entitled to absolute privilege from suit as to the Plaintiff's claim of intentional interference with contractual relations.[10]

A third type of immunity is governmental immunity. Pennsylvania's statutory governmental immunity applies to a political subdivision's acts despite the fact that official immunity may not apply to a political subdivision's agents. *Kessler v. Monsour*, 865 F.Supp 234 (M.D.Pa. 1994). Civil actions against public officials in their "official capacity" are in fact civil actions against the political subdivision which the public official represents. *Smith v. School District of Philadelphia*, 112 F.Supp.2d 417, 424-425 (citing *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361-362, 116 L.Ed.2d 301, 309 (1991)). Therefore, to the extent that the Defendants are being sued in their official capacity,

---

[10]Because of the application of the absolute privilege to the Defendants as "high public officials", the Defendants need not rely upon the "official immunity" of Pennsylvania law, which, it appears, would not immunize their alleged actions. *See Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239, 1252 (Pa. Commw. 2002).

the school district (through the Board) as a political subdivision is a party to this action and Pennsylvania's governmental immunity is the applicable statutory defense that the Defendant Board may invoke.

Pennsylvania law provides governmental immunity for claims of damages for injury to persons or property for local governmental agencies. 42 Pa.C.S.A. § 8541 (West 2006). Exceptions to this immunity exist, but the immunity is waived only for *negligent* acts of the local agency or its employee "acting within the scope of his office or duties with respect to one of the categories listed in subsection (b)." 42 Pa.C.S.A. § 8542 (West 2006). Subsection (b) provides eight categories of potential acts for which local agencies may be liable including "care, custody or control of real property" "personal property" of the local agency, and "operation of any motor vehicle" of the local agency. *Id.* It is clear from a reading of this governmental immunity statute that a local agency is not liable for intentional torts of its agents and/or employees. *Id. See also Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239, 1252 (Pa. Commw. 2002)(recognizing abrogation of immunity for "individuals only"); *Petula v. Mellody, et al.*, 631 A.2d 762, 765 (Pa. Commw. 1993)(dismissing defamation claim and finding that liability is only possible for "negligent acts" and not "willful misconduct" of "local agency employees"); *Acker v. Spangler*, 92 Pa. Commw. 616, 618, 500 A.2d 206, 207 (1985)(recognizing no exception to governmental immunity for "willful tortious conduct"); *Amnesty America v. County of Allegheny*, 822 F.Supp. 297, 301(W.D.Pa. 1993)(dismissing intentional tort allegations). Thus, the Board of Education of Turkeyfoot Valley Area School District is not liable

37

for the alleged intentional torts of members of its Board.[11]

As a result of the application of the immunities above, the Court need not consider whether the Defendants acted "improperly" in considering the merits of the allegations of tortious interference with contractual relations. As to Count VII, summary judgment is granted as to the Defendants.

An appropriate Order follows.

AND NOW this 25th day of September, 2006, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendants' Motion for Summary Judgment (Document No. 74) is GRANTED and, accordingly, all counts are dismissed with prejudice. Judgment shall be entered in favor of Defendants against Plaintiff and the Clerk of Court is directed to mark this matter closed.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

---

[11]The Plaintiff's characterization of *Cooper v. City of Chester*, 810 F.Supp. 618 (E.D.Pa. 1992) found on page twenty-two of her brief is incorrect as immunity is granted to local agencies for the intentional torts of any agency employees, but no immunity exists for local agency employees in their individual capacity when they have committed intentional torts. *Cooper* at 626, n. 8.

38